NO. 14-1997 (L) and NO. 14-2053

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

GRAYSON CONSULTING, INC.,

*Appellant,*

v.

VISION INTERNATIONAL PEOPLE GROUP, LTD.,

*Appellee.*

**and**

GRAYSON CONSULTING, INC.,

*Cross-Appellee,*

v.

TOTAL ECLIPSE INTERNATIONAL, LTD.,

*Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

OPENING BRIEF OF APPELLANT, GRAYSON CONSULTING, INC.

Tucker H. Byrd, Esq.
BYRD TRIAL GROUP
TUCKER H. BYRD & ASSOCIATES, P.A.
180 Park Avenue North, Suite 2A
Winter Park, FL 32789
Tel: (407) 392-2285
Fax: (407) 392-2286
E-mail: TByrd@ByrdTrialGroup.com
Attorney for Appellant, Grayson Consulting, Inc.

# DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

In compliance with Federal Rule of Appellate Procedure 26.1, and Local Rule 26.1, Appellant, Grayson Consulting, Inc., makes the following disclosure:

1. **Is party/amicus a publicly held corporation or other publicly held entity?**  ☐ YES ☒ NO

2. **Does party/amicus have any parent corporations?**  ☐ YES ☒ NO
   **If yes, identify all parent corporations, including grandparent and great-grandparent corporations:**

3. **Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?**  ☐ YES ☒ NO

4. **Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?**  ☐ YES ☒ NO
   **If yes, identify entity and nature of interest:**

5. **Is party a trade association?**  ☐ YES ☒ NO
   **If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:**

6. **Does this case arise out of a bankruptcy proceeding?**  ☒ YES ☐ NO
   **If yes, identify any trustee and the members of any creditors' committee:**

   Kevin Campbell was the original trustee, who assigned his claim to Grayson Consulting, Inc.  No creditor committee was formed.

ii

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS  ii

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUE PRESENTED ............................................ 2

STATEMENT OF THE CASE ................................................................. 2

I.      Nature of the Case ................................................................... 2

II.     Course of the Proceeding and Disposition of Lower Tribunal .................... 3

III.    Statement of Facts ................................................................... 7

IV.     Standard of Review ................................................................ 14

SUMMARY OF THE ARGUMENT ...................................................... 15

ARGUMENT AND CITATIONS OF AUTHORITY ............................... 17

I.      WHETHER THE DISTRICT COURT ERRED IN DISMISSING VISION FOR LACK OF PERSONAL JURISDICTION? ..................................... 17

   A.   South Carolina's Long-Arm Statute .......................................... 18

       1. Purposeful Availment ........................................................ 21

       2. The Causes of Action Arises From Vision's Activities Through its Agents and Co-conspirators in South Carolina. ..................................... 26

       3. The Reasonableness Requirement. .......................................... 26

   B.   Alternative Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2). .. 28

CONCLUSION ................................................................................... 30

CERTIFICATE OF COMPLIANCE ........................................................................32

CERTIFICATE OF SERVICE ..............................................................................32

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases:**</u>

*Base Metal Trading v. Ojsc Novokuznetsky Aluminum*,
　　283 F. 3d 208 (4th Cir. 2002)………………………………………………28

*Blue Ridge Bank v. Veribanc, Inc.*,
　　755 F. 2d 371 (4th Cir. 1985)…………………………………………………23

*Bonavire v. Wampler*,
　　779 F. 2d 1011 (4th Cir. 1985)………………………………………………..22

*Burger King v. Rudzewicz*,
　　471 U.S. 462 (1985)………………………………………………20, 21, 26, 27

*Calder v. Jones*,
　　465 U.S. 783 (1984)……………………………………………………22-23

*CFA Institute v. Financial Analysis of India*,
　　551 F. 3d 285 (4th Cir. 2009)…………………………………………………17

*The Christian Science Bd. v. Nolan*,
　　259 F. 3d 209 (4th Cir. 2001)…………………………………………………14

*Combs v. Bakker*,
　　886 F. 2d 673 (4th Cir. 1989)………………………………………………..14-15

*CompuServe, Inc. v. Patterson*,
　　89 F. 3d 1257 (6th Cir. 1996)………………………………………………..19, 26

*Ethanol Partners Accredited v. Wiener, Zukerbrot, Weiss & Brecher*,
　　635 F. Supp. 15 (E.D. Pa. 1985)………………………………………...21

*Fernander v. Thigpen*,
　　278 S.C. 140, 293 S.E. 2d 424 (1982)…………………………………..22

*Fuyao N. Am, Inc. v. Dakotaland Autoglass*,
  2011 WL 1002959 (D. S.C. March 18, 2011)…………………………..19, 27

*Gathers v. Harris Teeter Supermarket, Inc.,*
  282 S.C. 220, 317 S.E. 2d 748 (S.C. App. 1984)……………………………22

*Grayson v. Cathcart,*
  2013 WL 1442316 (D. S.C. April 9, 2013)…………....................................27

*In re Derivium Capital, LLC*,
  716 F. 3d 355 (4th Cir. 2013)…………………………………………..……..7

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)…………………………………………………………...20

*Miller v. Asensio*,
  101 F. Supp. 2d 395 (D. S.C. 2000)…………………………….………..29

*Mitrano v. Hawes*,
  377 F. 3d 402 (4th Cir. 2004)…………………………….……………14

*Tire Eng'g v. Shandong Linglong Rubber Co.*,
  682 F. 3d 292 (4th Cir. 2012)………………………………………………22

*Universal Leather, LLC v. Koro AR, S.A.,*
  773 F. 3d 553 (4th Cir. 2014)…………………………………….……25

*Verizon Online Svs., Inc. v. Ralsky*,
  203 F. Supp. 2d 601 (E.D. Va. 2002)…………………………....15, 17, 19-22

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)…………………………………………………………..20

**Statutes:**

S.C. Code §§ 36-2-803(A)(1)(c) & (d)…………………………………………..7, 19

18 U.S.C. § 1341…………………………………………………………..29

18 U.S.C. § 1343…………………………………………………………..29

18 U.S.C. § 1344…………………………………………………………..29

28 U.S.C. § 1291……………………………………………………………1

**<u>Rules:</u>**

Fed. R. Civ. P. 4(k)(2)……………………………………………...3, 7, 17, 18, 28

Fed. R. Civ. P. 12(b)(2)…………………………………………………14

Fed. R. Civ. P. 54(b)………………………………………………...5-6

Fed. R. Civ. P. 58…………………………………………………...5

## STATEMENT OF JURISDICTION

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 because the order from which the appeal was taken was a final decision of the District Court.

## STATEMENT OF THE ISSUE PRESENTED

I.    WHETHER THE DISTRICT COURT ERRED IN DISMISSING
      APPELLEE, VISION INTERNATIONAL PEOPLE GROUP, LTD., FOR
      LACK OF PERSONAL JURISDICTION?

## STATEMENT OF THE CASE

### I.    Nature of the Case

This case concerns a notorious "Ponzi" scheme that continued from approximately 1997 to 2005 based in Charleston, South Carolina, involving a fraudulent stock loan program to provide a financial product known as a "90% Stock Loan." The schemers induced borrowers to deliver publicly-traded stock to purported lenders who represented that loans for 90% of the value of the stock would be made, and secured by the stock, which would be held by the lenders and preserved by a so-called "proprietary hedging" strategy. The program was a complete lie, as the pledged stock was immediately liquidated and the proceeds used in part to fund the loans, and the balance for the schemers' gain.

Appellant, Grayson Consulting, Inc. ("Grayson Consulting"), as successor by assignment to the claims held by the bankruptcy estate of Derivium Capital, LLC ("Derivium"), brought this action against Appellee, Vision International People Group, Ltd. ("Vision"), and its wholly-owned subsidiary, Total Eclipse International, Ltd. ("Total Eclipse"), and others, asserting various claims, including

2

claims to recover the fraudulent transfer of assets.[1]  Grayson Consulting asserted that the District Court had personal jurisdiction over Vision and Total Eclipse under the South Carolina Long-Arm Statute, or alternatively under Federal Rule of Civil Procedure 4(k)(2) allowing for nationwide service of process.  The District Court, in the face of conflicting record evidence, dismissed Grayson Consulting's claims against Vision for lack of personal jurisdiction without conducting an evidentiary hearing, and Grayson Consulting appeals this ruling.

## II.    Course of the Proceeding and Disposition of Lower Tribunal

On August 31, 2007, Kevin Campbell, Derivium's Chapter 7 Trustee, filed suit in Case No. 2:07-CV-2992 (the "2992 Case") against Vision and other participants in the 90% Stock Loan scheme.  [A. 77.]  The Trustee later assigned the claims to Grayson Consulting.  [DE 549.]

In a related case, on February 28, 2007, Alan M. Grayson and his trust, AMG Trust (collectively, "Grayson"), filed a separate suit in Case No. 2:07-CV-593 (the "593 Case") against the participants involved in the 90% Stock Loan scheme.  [DE 1 in the 593 Case.]  The two matters, along with matters asserted by other creditors,

---

[1] Grayson Consulting also brought claims against Vision under the Bankruptcy Code for § 542 turnover, § 544(b)/S.C. Code 27-23-10 actual fraud, § 544(b)/S.C. Code 27-23-10 constructive fraud, § 548 actual fraud, § 548 constructive fraud, § 549, conversion, quantum meruit, and for constructive trust, accounting, and injunction.  [A. 407-408.]

3

were consolidated together for purposes of discovery and trial as to claims against certain defendants, Charles Cathcart; Evelyn Cathcart; Yuri Debevc; Scott Cathcart; Veridia Solutions, LLC; Veristeel, Inc.; The Scott and Whitney Cathcart Family Trust; Charles D. Cathcart Crusader Trust; Cathcart Investment Trust; Cathlit Investment Trust; SDC Fern Hill Residential Trust; WJC Fernhill Residential Trust; Perseverus, Inc.; Bancroft Ventures, Ltd.; Spencer Partners, Ltd.; Spencer Venture Partners; and Derivium Capital (USA) Inc. (hereinafter, the "2009 Trial Defendants"). [DE 6; 93; 418.]  The jury returned a verdict against the 2009 Trial Defendants for $150,478,525.29. [A. 143.]  A Final Judgment was entered against the 2009 Trial Defendants on April 28, 2010, which was later affirmed on appeal. [DE 413; 461; 462; 471.]

The claims against Vision in the 2992 Case and the 593 Case were stayed pending the outcome of the trial and appeal of the claims against the 2009 Trial Defendants.  [DE 418.]  Thereafter, Grayson Consulting and Grayson resumed pursuing their claims against the remaining defendants, including Vision.

On April 15, 2013, Vision and Total Eclipse filed Motions to Dismiss for Lack of Personal Jurisdiction in the underlying actions. [A. 181; 245.] Grayson Consulting and Grayson filed their Consolidated Response to the Motions to Dismiss on June 18, 2013 [A. 306], and the District Court granted Vision's Motion on October 23,

4

2013. [A. 406.]  Grayson Consulting and Grayson filed a Motion for Reconsideration which the District Court denied on February 14, 2014. [A. 418; 448.]  The District Court denied Total Eclipse's Motion to Dismiss on December 10, 2013.  [A. 434.]

Grayson Consulting and Grayson continued pursuing their claims against defendants Patrick Kelley, Randolph Anderson, and Total Eclipse, which culminated in a trial that resulted in jury verdicts rendered on April 23, 2014. [DE 767-772; DE 1202-1208 in the 593 Case.]  The Clerk, without directions from the Judge, entered filings denominated "judgments," albeit not final, appealable judgments contemplated by Federal Rules of Civil Procedure 54(b) and 58, in favor of defendants Kelley and Anderson [DE 1214 in the 593 Case], and Total Eclipse [A. 453; DE 1214 in the 593 Case.]

After the trial, Grayson Consulting and Grayson filed motions seeking judgments against non-appearing Defendants Clifford Lloyd (the 2992 Case), Nigel Wood (the 593 Case), Metarizon Solutions, LLC a/k/a Metarizon, LLC (the 593 Case), and Tsuei Consultants, Inc. (the 2992 Case) (collectively, the "Non-Appearing Defendants"). [DE 784; DE 1220, 1222 in the 593 Case.]  On August 20, 2014, the District Court granted the Motions for Default Judgment against each of the Non-Appearing Defendants, and dismissed "any and all remaining claims against all other defendants that have not otherwise been addressed by this order," save for

5

the claims against Defendant Sandifer, which remain stayed because he had filed bankruptcy. [A. 454; DE 1229 in the 593 Case.] Thereafter, the Clerk entered judgments in the respective Plaintiffs' favor as to the Non-Appearing Defendants. [DE 791-792 (judgments against Lloyd and Tsuei, respectively); DE 1230-1231 in the 593 Case (judgments against Wood and Metarizon, respectively).]

Grayson Consulting and Grayson filed Notices of Appeal on September 19, 2014. [A. 462.] Subsequently, Grayson Consulting and Grayson filed a Consolidated Motion for a Determination of Finality of Judgments under Federal Rule of Civil Procedure 54(b) in an attempt to confirm the finality of the dismissal Order as to Vision and the judgments as to Defendants Kelley, Anderson, and Total Eclipse, and the other Defendants. [A. 468.] The District Court denied the Rule 54(b) Motion on the basis that the filing of the Notices of Appeal by Grayson Consulting and Grayson had divested the District Court of jurisdiction to rule on the Motion, and thereby affirmed the finality of the Order and Judgments. [A. 488.]

The Order and Judgments became final for purposes of appeal no earlier than August 20, 2014, upon the District Court's adjudication of the last of the claims as against the parties to the action, which was less than 30 days prior to the filing of the Notices of Appeal. Grayson Consulting seeks review of the District Court's dismissal of Vision from the case *sub judice* (the 2992 Case) arguing that Vision's

6

tortious conduct subjected it to jurisdiction under the South Carolina long-arm statute (S.C. Code §§ 36-2-803(A)(1)(c) & (d)), or alternatively under Federal Rule of Civil Procedure 4(k)(2) for violations of federal law (Bankruptcy Code prohibitions against fraudulent transfers). In a companion appeal in the 593 Case, Grayson also seeks review of the District Court's dismissal of Vision under the South Carolina long-arm statute for its tortious conduct, and under Federal Rule of Civil Procedure 4(k)(2) for RICO violations.[2]

## III.    Statement of Facts

Derivium, based in Charleston, South Carolina, was the epicenter of the massive 90% Stock Loan "Ponzi" Scheme which collapsed into bankruptcy in 2005. *In re Derivium Capital, LLC*, 716 F. 3d 355, 358 (4th Cir. 2013). Under the scheme, Derivium customers transferred stocks to Derivium in exchange for three-year nonrecourse loans for 90% of the stocks' market value. *Id*. at 359. The 90% Stock Loan scheme was fictive, insolvent from inception, and eventually collapsed causing Derivium in September 2005 to file for Chapter 11 bankruptcy in the Southern District of New York. *Id.* at 358. The court converted the case to Chapter 7 and

---

[2] Appeal Case No. 14-1991.

7

transferred it to the District of South Carolina, where Kevin Campbell was appointed Derivium's trustee. *Id.*

Grayson entered into "stock loan" agreements with Derivium. [DE 469-1 at pp. 2-3 in the 593 Case.] Under the scheme, Bancroft Ventures Limited ("BVL") served as the so-called "lender" for Grayson's loans that were given in return for the stock delivered to Derivium for custodial safekeeping. [DE 647-5; DE 1031-5 in the 593 Case.] BVL was an Isle of Man entity, with its principal place of business in South Carolina. [DE 647-3 at 66:9-67:2.] Paul Jarvis served as the CFO and sole officer of BVL for the entirety of BVL's existence. [A. 310; 442.] Bancroft Ventures (UK) Ltd. ("Bancroft UK") was a wholly-owned subsidiary of BVL, funded by BVL, directed by Jarvis, and under his common control along with Total Eclipse, and later Vision. [DE 665-1 at 51:15-17.] After the scheme collapsed, so intertwined were the affairs of Derivium and BVL and Bancroft UK that the District Court determined that "property of BVL is 'property of the [Derivium] estate' under 11 U.S.C. § 541." [A. 180.]

Jarvis also served as an officer of other foreign entities, Total Eclipse and later Vision, which facilitated the fraud perpetrated by Derivium, BVL, and Bancroft UK. Jarvis served as the principal officer of Total Eclipse, and later, when Total Eclipse

was acquired by Vision on October 8, 2003, Jarvis also served as the CEO of Vision

from 2003 until March 27, 2006.  [DE 647-2 at p. 7; DE 665-1 at 33:15-16, 36:3-4.]

The tentacles of the scheme snaked through Jarvis and reached Total Eclipse,

which he wholly owned and controlled. The District Court adequately summed up

the role Jarvis played to implicate Total Eclipse in the scheme in denying the

jurisdictional challenges of Total Eclipse:

> . . . Jarvis frequently communicated with co-defendants based in South
> Carolina in order to transact business related to the Stock Loan
> Program.  See, e.g., Pls.' Resp. Exs. 29, 39, 41, & 50.  In addition to his
> role at TEI, Jarvis was the sole officer of Bancroft Ventures, Ltd.
> ("Bancroft"), an entity that acted as the "lender" for the loans that
> Derivium Capital, LLC made to Grayson.  The parties agree that TEI
> provided consultancy services for Bancroft Ventures (UK), Ltd.
> ("Bancroft UK"), a wholly-owned subsidiary of Bancroft. TEI Mot. to
> Dismiss Ex. 5 at 19 (showing that Bancroft UK paid £ 51,659.00 to TEI
> in 2002 for consultancy services and other fees).  Even counsel for TEI
> explained at the July 1, 2013 hearing that an invoice issued to Bancroft
> for roughly $12,000 for consultancy services, Pls.' Resp. Ex. 76,
> memorializes the transfer of money from Bancroft to TEI for services
> that Jarvis provided.  Indeed, notes from a June 18, 2003 Bancroft
> meeting reference the services rendered by TEI.  Pls.' Resp. Ex. 16 at
> 1 ("Accounts are being prepared by Total Eclipse.").   While TEI
> maintains neither an office nor an agent in South Carolina and owns no
> property in the state, TEI has extensively communicated with at least
> one South Carolina resident regarding business transactions that are
> implicated in this litigation. In keeping with TEI's acknowledged role
> as the preparer of Bancroft's accounts, Jarvis – from his TEI email
> address – frequently corresponded with Robert Nagy, a South Carolina-
> based accountant who worked for Derivium.  See, e.g., Pls.' Resp. Ex.
> 28 (email from Jarvis' TEI email account to Nagy that references a
> previous conversation and raises several issues regarding Bancroft

accounts); id. Ex. 29 (email from Nagy to Jarvis's TEI email account regarding the preparation of Bancroft's financial statements); id. Ex. 39 (email from Nagy to Jarvis's TEI email account regarding Bancroft balance sheets and noting a planned meeting between Jarvis and Nagy in Charleston, South Carolina). Jarvis also communicated directly with Derivium executives. See Pls.' Resp. Ex. 19 (introductory email from Jarvis's TEI email account to Scott Cathcart providing the TEI email address as the best contact); id. Ex. 59 (email from Jarvis's TEI email account to Scott Cathcart regarding the "development of Derivium in Europe"). Jarvis, who controlled both TEI and Bancroft, apparently travelled to South Carolina to meet with Nagy regarding Bancroft's financial statements, a portion of Bancroft's business that TEI handled through its consultancy work.

[A. 441-443] (footnotes omitted).

Jarvis then extended the reach of the scheme to Vision in 2003 which, after due diligence prior to the acquisition, had acquired Total Eclipse and installed Jarvis as its CEO. [A. 334; DE 647-2 at p. 57.] With the assistance of Vision's Internal Legal Advisor, Ismini Papacosta, Jarvis impelled Vision to facilitate and perpetuate the scheme which is chronicled in Grayson Consulting's and Grayson's Consolidated Response to the jurisdictional challenges of Vision and Total Eclipse. [A. 337-344.] Grayson Consulting and Grayson set forth a plethora of facts, documents, and other evidence of the many ways in which Jarvis commandeered Vision to perpetuate the scheme in several material respects [A. 330-351], including, without limitation:

10

- Vision's headquarters, facsimiles, telecommunications, computers, intellectual property (logos), and other equipment and property were used in connection with the 90% Stock Loan scheme by Jarvis and Papacosta directed to residents and agents in South Carolina [A. 312];

- Jarvis on several occasions used the offices and the imprimatur of Vision in an attempt to quell an inquiry by the California Department of Corporations (DOC) into the practices of Derivium and BVL [A. 335-336; DE 648-7; DE 650-2; DE 650-3 at 87:20-88:20; DE 651-3];

- Papacosta served as the corporate secretary for Total Eclipse, which had no employees, and was managed entirely by Vision [DE 647-1 at 5:5-6, 7:23, 9:3-21, 14:23-24, 15:5-6, 16:14-17:24; DE 647-2 at pp. 22, 54, 57];

- Papacosta conducted business on behalf of BVL as its counsel; facilitated the sale of BVL's assets; relocated BVL from Isle of Man to Cyprus; directly communicated and authorized BVL's South Carolina agent (Yuri Debevc) to send out communications on BVL's behalf from South Carolina to its South Carolina and other United States resident victims; requested the removal of BVL's South Carolina-based 90% Stock Loan scheme business documents and records from South Carolina; corresponded with South Carolina law firm Ten State Street personnel on a variety of matters relating to BVL; authorized Debevc in South

11

Carolina to pay BVL's South Carolina litigation counsel from BVL's South Carolina Wachovia bank account; and accepted the resignations of BVL's Isle of Man directors and the appointments of Cyprus-based directors [A. 337-344].

- Papacosta had direct contract with South Carolina residents about the 90% Stock Loan scheme [A. 343; A. 412; DE 647-3 at 25:22-25; DE 651-3 at p. 21];

- Vision's Board of Directors included Paul Jarvis (CEO until 4/10/2006) [DE 647-2 at p. 14];

- Ismini Papacosta was Secretary for the Board of Vision beginning April 21, 2004, until she left the company in 2009 [DE 647-2 at p. 14];

- Vision disclosed Total Eclipse and Bancroft UK each as a "related party" and an "entity under common control," in its 2003 and 2004 Annual Statements [A. 333];

- Jarvis (Vision's CEO) continued to prepare the Bancroft UK financial statements for Total Eclipse even after Total Eclipse had been acquired by Vision [A. 327-328];

- Jarvis was both an agent for Vision and BVL, which transferred thousands of pounds to Bancroft UK, funds that came from the 90% Stock Loans administered in South Carolina [A. 328-329];

12

- After Vision hired Jarvis as CEO, Vision's CFO, Kyriakos Kolocassides billed Bancroft UK for "consultancy services," which led to the fraudulent transfer of assets of approximately $12,000 [A. 332]; and

- Total Eclipse continued to promote the 90% Stock Loans to United States customers on its website for at least seven months after it was acquired by Vision. [A. 330; DE 651-9.]

Although the District Court correctly ruled that Total Eclipse was subject to the jurisdiction of the court because it closely worked with BVL and Bancroft UK to conduct business in South Carolina [A. 434-447], the District Court incorrectly ruled that Jarvis' utilization of Vision, its personnel, and resources, did not likewise subject Vision to jurisdiction in this action. The District Court attempted to distinguish the ways in which Jarvis utilized Total Eclipse and Vision in a footnote in its Order denying Total Eclipse's jurisdictional challenge:

> The court distinguishes between these communications, which implicate TEI, and the communications sent by Jarvis and Ismini Papacosta from their Vision International People Group, P.L. email accounts and fax machines. The distinction lies in the content of these communications, which demonstrate that Jarvis was acting on behalf of TEI, and in other evidence that supports the same conclusion. The evidence clearly shows that TEI provided services to Bancroft and, ultimately, to the 90% Stock Loan Program. The emails that Jarvis sent from his TEI email account to Scott Cathcart and Robert Nagy, for example, discuss the services that TEI provided to Bancroft.

13

[A. 442 at n. 2.] The District Court drew a distinction between the treatment of Total Eclipse and its parent entity, Vision, for jurisdictional purposes, where none existed. Both should have been subject to the jurisdiction of the District Court.

## IV.    Standard of Review

Grayson Consulting seeks review of the District Court's Order granting Vision's Motion to Dismiss for Lack of Personal Jurisdiction. Appellate review of a District Court's exercise of personal jurisdiction is *de novo* when the ruling was not preceded by an evidentiary hearing. *Mitrano v. Hawes*, 377 F. 3d 402, 406 (4th Cir. 2004) ("When a district court rules on personal jurisdiction without holding an evidentiary hearing, we view the facts in the light most favorable to the plaintiff and determine *de novo* whether he has made a *prima facie* showing of personal jurisdiction."); *see also The Christian Science Bd. v. Nolan*, 259 F. 3d 209, 215 (4th Cir. 2001) (whether a defendant's contacts with the forum state are "sufficient to support the district court's exercise of personal jurisdiction is a question of law which we review *de novo*").

When a district court's personal jurisdiction is challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the burden is on the plaintiff to establish grounds for jurisdiction by a preponderance of the evidence. *Combs v. Bakker*, 886 F. 2d 673, 676 (4th Cir. 1989). If no evidentiary hearing is held, however, the burden

14

on the plaintiff is simply to make a "*prima facie* showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *Verizon Online Svs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 609 (E.D. Va. 2002) (*quoting Combs*, 886 F. 2d at 676).

In resolving the issue of personal jurisdiction, a court must construe all relevant allegations in the light most favorable to the plaintiff and draw the most favorable inferences for the existence of jurisdiction. *Id*. (*citing Combs,* 866 F.2d at 676)). "If the existence of jurisdiction turns on disputed factual questions, the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs*, 886 F. 2d at 676.

## <u>SUMMARY OF THE ARGUMENT</u>

The District Court erred in two distinct ways in dismissing the claims against Vision for lack of jurisdiction. First, the District Court applied the wrong legal standard to determine jurisdiction. Because the District Court did not conduct an evidentiary hearing to resolve the conflicting evidence on the jurisdictional issue, Grayson Consulting and Grayson only needed to make a *prima facie* showing to establish jurisdiction. Instead, the District Court held Grayson Consulting and Grayson to a higher standard – by a preponderance of the evidence – in dismissing Vision. Second, the District Court improperly weighed and considered the evidence,

15

failing to consider the relevant evidence in the light most favorable to Grayson Consulting and Grayson, failed to draw the most favorable inferences toward Grayson Consulting and Grayson, and in some cases ignored altogether the evidence of Vision's involvement in the "Ponzi" scheme.  In one glaring example, the District Court acknowledged "that many messages were sent from Vision email accounts or fax machines" to South Carolina, but rather than construe this evidence and related inferences in the light most favorable to Grayson Consulting and Grayson (that Vision was a participant in the scheme through its agents), the District Court construed the evidence and related inferences against Grayson Consulting ("The evidence presented could just as easily show that Jarvis and his subordinates misused Vision resources to do non-Vision work.").  [A. 413.]

Federal District Courts have a special interest in exercising jurisdiction over those who injure persons in the forum state and the United States, as occurred in this case.  This is true regardless whether the wrongdoer commits the act outside the forum state, as long as the effect is felt within the forum state.  Further, when a foreign wrongdoer collaborates or conspires with a local wrongdoer, the contacts with the forum state of the local wrongdoer should be imputed to the foreign wrongdoer, subjecting both to the jurisdiction in the forum state.

Grayson Consulting and Grayson at least made a *prima facie* showing of jurisdiction under the South Carolina Long-Arm statute or Federal Rule of Civil Procedure 4(k)(2) (for violations of federal law – applicable Bankruptcy Code provisions prohibiting fraudulent transfers), and the District Court should not have disposed of the jurisdictional issue without an evidentiary hearing.  And because the issues of jurisdiction were so intertwined with the merits of the underlying claim, rather than conducting an evidentiary hearing, the District Court should have deferred ruling on the jurisdictional issue until the trial, when all the evidence was before the court. The District Court did neither, and instead summarily ruled in the face of a prodigious amount of evidence supporting the exercise of jurisdiction. Thus, the District Court's Order granting Vision's Motion to Dismiss must be reversed.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    WHETHER THE DISTRICT COURT ERRED IN DISMISSING VISION FOR LACK OF PERSONAL JURISDICTION?

To determine whether personal jurisdiction exists over a nonresident defendant, courts engage in a two-step inquiry.  *CFA Institute v. Financial Analysis of India*, 551 F. 3d 285, 292 (4th Cir. 2009); *Verizon*, 203 F. Supp. 2d at 609.  First, the court looks to the law of the forum state, in this case the South Carolina long-

17

arm statute, to assess whether the plaintiff's cause of action against the defendant

and the nature of the defendant's contacts with South Carolina fall within the law's

scope.  *Id*.  Second, the court must determine whether the reach of the long-arm

statute comports with the Due Process Clause of the Fourteenth Amendment of the

United States Constitution.  *Id*.  Even if the District Court here lacked jurisdiction

under the South Carolina long-arm statute, the court still had jurisdiction under

Federal Rule of Civil Procedure 4(k)(2).

### A.    South Carolina's Long-Arm Statute.

No one could credibly dispute that the claims asserted against Vision[3] fell

within the scope of South Carolina's long-arm statute which provides:

> A court may exercise personal jurisdiction over a person who acts
> directly or by an agent as to a cause of action arising from the person's:
> (1) transacting any business in this State; (2) contracting to supply
> services or things in the State; (3) commission of a tortious act in whole
> or in part in the State; (4) causing tortious injury or death in this State
> by an act or omission outside this State if he regularly does or solicits
> business, or engages in any other persistent course of conduct, or
> derives substantial revenue from goods used or consumed or services
> rendered, in this State . . . .

---

[3] Grayson Consulting and Grayson, through the 2992 Case and the 593 Case, have asserted the
following claims against Vision: fraud; aiding and abetting fraud; South Carolina Uniform
Securities Act fraud; RICO; negligent misrepresentation; aiding and abetting breach of fiduciary
duty; conversion; civil conspiracy; violation of South Carolina Unfair Trade Practices Act;
fraudulent conveyance; quantum meruit; violations of various sections of South Carolina's Code;
constructive trust; accounting; and injunction. [A. 407-408.]

18

S.C. Code §§ 36-2-803(A)(1)(c) & (d), Personal jurisdiction based upon conduct.

The real dispute is whether the exercise of jurisdiction in this case comports with due process. The Supreme Court of South Carolina has interpreted South Carolina's long-arm statute to extend to the outer limits of Fourteenth Amendment due process. *Fuyao N. Am, Inc. v. Dakotaland Autoglass*, 2011 WL 1002959, *3 (D. S.C. March 18, 2011) (holding that South Carolina treats its long-arm statute as coextensive with the due process clause). Fourth Circuit "precedent recognizes that a district court's exercise of personal jurisdiction over a particular defendant may rest upon limited contacts with the forum state, so long as due process is not offended." *Id*. at 293. As the United States Supreme Court and others have frequently noted, "the confluence of the 'increasing nationalization of commerce' and 'modern transportation and communication' carries with it a 'resulting relaxation of the limits that the Due Process Clause imposes on courts' jurisdiction." *Verizon*, 203 F. Supp. 2d at 605 (*quoting CompuServe, Inc. v. Patterson*, 89 F. 3d 1257, 1262 (6th Cir. 1996)).

The Due Process Clause is satisfied for personal jurisdiction purposes if a defendant has "purposefully availed itself of the privilege of conducting business in the forum state" by establishing sufficient "minimum contacts" "such that maintenance of the suit does not offend traditional notions of fair play and

19

substantial justice." *Id*. (*quoting Burger King v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)). A defendant has sufficient minimum contacts with a state when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id*. (*quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Courts also consider whether "the defendant has 'purposely directed' his activities at residents of the forum." *Id*. (*quoting Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

Grayson Consulting has alleged specific jurisdiction in this action, so the focus of the due process analysis is on the relationship among the defendant, the forum, and the litigation. *Verizon*, 203 F. Supp. 2d at 611. This analysis entails three steps. *Id*.

First, the court must determine whether the defendant "purposefully avail[ed] [itself] of the privilege of conducting activities within the forum State." *Id*. Second, the court must assess whether the causes of action alleged by the plaintiff arise from the defendant's activities in the forum. *Id*. Finally, the court must ask whether the acts by the defendant, or the consequences of the acts caused by defendants, have a substantial enough connection with the forum to render the exercise of jurisdiction over the defendant "constitutionally reasonable." *Id*.

20

1.   **Purposeful Availment**.

The seminal case with regard to purposeful availment is *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).   The court should examine whether "the defendant's conduct and connection with the state are such that he should reasonably anticipate being haled into court there."   *Verizon*, 203 F. Supp. 2d at 612 (*citing Burger King,* 471 U.S. at 474).   This requirement is satisfied when the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum State.   *Id*.   The absence of physical contact or presence in the state will not defeat jurisdiction so long as the defendant is deliberately engaged in efforts within the state.   *Id*. at 613 (*citing Burger King,* 471 U.S. at 476).

A defendant can be deemed to have purposely availed itself of the privilege of conducting activities in the state when it acts through an intermediary in the state, such as co-conspirator, or through a simple agent, and when its conduct outside the state has an "effect" inside the state.

When the cause of action includes a conspiracy, the court properly should look to the contacts of one co-conspirator and impute those contacts to other co-conspirators.   *See Ethanol Partners Accredited v. Wiener, Zukerbrot, Weiss & Brecher*, 635 F. Supp. 15, 18 (E.D. Pa. 1985) ("When co-conspirators have sufficient

21

contacts with the forum, so that due process would not be violated, it is imputed against the 'foreign' co-conspirators who allege there are not sufficient contacts; co-conspirators are agents for each other."); *accord Verizon*, 203 F. Supp. 2d at 622 (same).    This Court generally has concluded that a foreign defendant has purposefully availed itself of the privilege of conducting business in the forum state when the defendant "substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute." *Tire Eng'g v. Shandong Linglong Rubber Co.*, 682 F. 3d 292, 302 (4th Cir. 2012); *see also Bonavire v. Wampler*, 779 F. 2d 1011, 1014 (4th Cir. 1985) (affirming that a nonresident participating in a conspiracy with residents to commit fraud in Virginia subjected the nonresident co-conspirator to jurisdiction).

   Similarly, the conduct of an agent committed within the scope of their employment or agency may subject the principal defendant to jurisdiction. *Fernander v. Thigpen,* 278 S.C. 140, 293 S.E. 2d 424 (1982). Typically questions of agency and whether the employee was acting "within the scope" of his employment are questions to be resolved by the jury. *Gathers v. Harris Teeter Supermarket, Inc.,* 282 S.C. 220, 317 S.E. 2d 748 (S.C. App. 1984).

   The Supreme Court has recognized that a defendant purposely avails itself of the benefits of the forum state when a tortious act committed outside the forum state

has an "effect" in the forum state. *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, the Supreme Court established an "effects test" for intentional torts aimed at the forum state, and found that California had jurisdiction over Florida reporters who published libelous articles for the *The National Enquirer* because the "'effects' of their Florida conduct [were felt] in California." *Id.* at 784.

Grayson Consulting and Grayson[4] felt the brunt of the harm caused by Vision, its agents, and co-conspirators, in South Carolina where the 90% Stock Loan scheme began. [A. 445]; s*ee, e.g., Blue Ridge Bank v. Veribanc, Inc.*, 755 F. 2d 371, 374 (4th Cir. 1985) (additional factor for exercising personal jurisdiction was fact that "brunt of the alleged injuries" in defamation case happened to a local bank in Virginia). Vision knew, or reasonably should have known, that its perpetuation of the scheme, and its sham receipt of assets transferred from Bancroft UK, would deplete assets and thwart the ability of creditors, such as Grayson Consulting and Grayson, to recover on the fraud.

Under either an agency, co-conspirator, or effects test, the District Court erred in finding no jurisdiction existed with respect to the claims against Vision. The District Court correctly wended its way through the labyrinthine network of

---

[4] After Vision became embroiled in the scheme in 2003, Grayson incurred $28,001,180.38 in damages under the 90% Stock Loan scheme. [A. 331; DE 654-2.]

fraudsters to connect Derivium, through BVL, to Jarvis, and thus to Total Eclipse, but the District Court's analysis fell short in making the final, ineluctable connection to Vision. Starting with the fact that Jarvis, after Total Eclipse had been acquired by Vision, and had assumed the role CEO of Vision, and further considering the manner in which Jarvis utilized the resources and personnel of Vision to perpetuate the scheme, just as he had first with BVL, then Total Eclipse, and finally with Vision, the District Court had ample evidence of a continuation of the scheme. [*See infra* pp. 9-13.] Jarvis was not some rogue operative working outside Vision's vision. He used his station of CEO, with the active assistance of Vision's legal counsel (Papacosta), to communicate and make representations in the name of Vision, with South Carolina residents and businesses. Together they utilized Vision to drain off the ill-gotten funds from the scheme through Bancroft UK, and when the scheme collapsed, they even assisted in removing BVL documents to Cyprus for safekeeping with Vision. [*See infra* p. 11.]

The District Court erred in concluding that "Grayson has failed to supply evidence that the actions taken by Jarvis and other Vision employees were taken within the scope of their employment." [A. 413.] The District Court, after acknowledging the direct involvement in the scheme of Jarvis and every other company (*i.e.,* BVL and Total Eclipse) with which he was associated prior to joining

24

Vision, concluded that Jarvis's habit of implicating any company he ran somehow – completely out of character for Jarvis – ended when he joined Vision. Yet, the evidence demonstrably showed that Jarvis' habits continued, if not intensified, when he joined Vision.

Perhaps the strongest indictment of Vision's complicity can be seen when Jarvis left Vision, after the scheme came to light and Vision was targeted for its alleged complicity. Rather than condemn Jarvis for his actions, Vision's Chairman Buriak paid Jarvis $1 million for his stake in Vision. [A. 351; DE 653-9; 653-10.]

At this stage before an evidentiary hearing or trial, any inferences regarding Jarvis' and Papacosta's actions and involvements, and Vision's connections with BVL, Bancroft UK, and Total Eclipse, must be construed in favor of Grayson Consulting's and Grayson's positions, regardless of the self-serving affidavits filed by Vision's current management. The conflicting proofs provided by Vision and Grayson Consulting prevented the District Court from ruling that it lacked jurisdiction over Vision, and the Order should be reversed so that Vision can be held accountable for its misconduct aimed at South Carolina (and the United States). *See Universal Leather, LLC. v. Koro AR, S.A.,* 73 F. 3d 553 (4th Cir. 2014) (reversing district court's finding that there was no personal jurisdiction where the parties had filed contradicting affidavits).

### 2.     The Causes of Action Arise From Vision's Activities Through its Agents and Co-conspirators in South Carolina.

Specific personal jurisdiction requires that the claim asserted arise out of the defendant's forum-related activities.     *CompuServe,* 89 F. 3d at 1267.     "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts."     *Id*. Grayson Consulting and Grayson's claims arose out of the activities because the losses were inflicted in South Carolina, and the effects of the depletion of scheme assets with which to compensate for those losses were felt there as well. [A. 445.]

### 3.     The Reasonableness Requirement.

Finally, the exercise of jurisdiction must be constitutionally reasonable.  To be reasonable, jurisdiction "must comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476.  Once the court finds "the first two elements of a *prima facie* case—purposeful availment and a cause of action arising from the defendant's contacts with the forum state—then an inference arises that this third factor is present."  *CompuServe*, 89 F. 3d at 1268.  A court should consider "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of

26

the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477.

"South Carolina has a strong interest in making sure its economic and business interests are adequately protected." *Fuyao,* 2011 WL 1002959 at *4. The District Court correctly determined that "South Carolina maintains a substantial interest in the resolution of Grayson's claims because much of the 90% Stock Loan scheme's business occurred in South Carolina or was transacted by South Carolina residents, and because South Carolina law applies to a number of Grayson's claims." [A. 445.][5]

The exercise of jurisdiction does not become unreasonable just because it may be inconvenient for Vision to defend a suit in South Carolina. Vision demonstrated its ability over the past several years to secure capable counsel in South Carolina and defend itself without undue burden. *See, e.g., Grayson v. Cathcart*, 2013 WL 1442316 (D. S.C. April 9, 2013).

---

[5] The District Court also noted, "Grayson has a significant interest in attempting to recover the millions of dollars that he allegedly lost through the 90% Stock Loan Program, an investment scheme that was based in Charleston." [A. 445.]

27

**B.     Alternative Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2).**

The District Court further compounded its errors when it summarily disposed of Grayson Consulting's and Grayson's jurisdictional argument under Federal Rule of Civil Procedure 4(k)(2) because Vision had sufficient contacts with the United States through its violation of federal law to confer jurisdiction.

Even if this Court finds that it lacks jurisdiction over Vision under South Carolina's long-arm statute, the Court should assert jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because Vision violated a federal statute and has sufficient contacts with the United States to satisfy due process.  Rule 4(k)(2) permits a federal court to assert jurisdiction in cases arising under federal law when the defendant lacks minimum contacts with any particular state, but has contacts with the United States as a whole.

Federal Rule of Civil Procedure 4(k)(2) allows the exercise of personal jurisdiction by a federal district court when three requirements are met:  (1) the claim must arise under federal law; (2) the defendant must not be "subject to jurisdiction in any state's courts of general jurisdiction"; and (3) the exercise of jurisdiction must be "consistent with the United States Constitution and laws."  *Base Metal Trading v. Ojsc Novokuznetsky Aluminum*, 283 F. 3d 208, 212 (4th Cir. 2002).

28

The District Court correctly found that Grayson Consulting's and Grayson's claims arise under federal law. Counts II and III of Grayson Consulting's Complaint arise under Title 11 of the U.S. Code (the Bankruptcy Act); and Count VI of Grayson's Third Amended Complaint arises under Racketeer Influenced and Corrupt Organizations Act ("RICO"/8 U.S.C. §§ 1341, 1343 and 1344). Pendent personal jurisdiction may also be exercised over Grayson Consulting's and Grayson's other claims, which all arise from the same nucleus of operative facts – the 90% Stock Loan scheme. *See, e.g., Miller v. Asensio*, 101 F. Supp. 2d 395, 403 (D. S.C. 2000) (once district court has personal jurisdiction over federal claim, it may exercise personal jurisdiction over remaining state-law claims).

In determining whether the exercise of jurisdiction over Vision would comport with due process, the District Court erred by summarily concluding that Grayson Consulting had failed to allege sufficient contacts with the United States. In making its determination, the District Court failed to recognize the numerous contacts Vision had in the United States as a whole.

In addition to the contacts with South Carolina, the scheme reached other parts of the United States. For example, the scheme included an entity known as Optech Limited. On July 26, 2005, Papacosta e-mailed Debevc in South Carolina (signing her e-mail as Legal Advisor to Vision and sent using Vision's computers and

domain), informing him that she had "reviewed the letter that [he] propose[d] to send to borrowers regarding the acquisition by Optech Limited [a registered California lender] of the Floating Rate Notes [another version of the fraudulent stock loan scheme], and confirmed that [he] is authorized to send it." [A. 342; DE 657-2; *see also* A. 320.] On August 2, 2005, Papacosta e-mailed further instructions to Debevc (again signing her e-mail as Legal Counsel to Vision), telling him to "advise all necessary parties" that "Bancroft has completed the sale of its FRN (Floating Rate Note) portfolio to Optech Limited." [A. 342; DE 657-3.]

From July of 2004 until March of 2005, no less than $2,760,805.52 was transferred from Optech to BVL for "hedging" and "fees" and "licensing." [A. 347; DE 658-6.] While under Vision's control, BVL faxed the "Invoice and License Fee Schedule" to Optech in Hong Kong. [A. 347; DE 657-8 at p. 3.] With the aid of Vision, those transfers were siphoned off or directed away from BVL and Derivium where creditors might have been able to access them, and instead were directed by Vision into its own pockets or the pockets of its co-conspirators.

## CONCLUSION

In sum, Vision should have reasonably anticipated being haled into South Carolina, or at least somewhere in the United States, for its involvement in the scheme. Whether holding Vision accountable because its "agents" or "co-

30

conspirators" residing or doing business in the forum state or United States committed acts in furtherance of the scheme here, or because its own actions perpetuated the scheme or thwarted the efforts of victims such as Grayson Consulting and Grayson to recover for their losses, the District Court had ample grounds existed to support the exercise of jurisdiction. The District Court should not have resolved the jurisdictional issue on conflicting evidence at least without an evidentiary hearing or, more appropriately, at the trial on the merits. Accordingly, the District Court's Order should be reversed and this matter remanded for further proceedings.

Dated: **March 16, 2015**.

*s/ Tucker H. Byrd*

**Tucker H. Byrd, Esq.**
Florida Bar No. 381632
**TUCKER H. BYRD & ASSOCIATES, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, FL 32789
Tel: (407) 392-2285
Fax: (407) 392-2286
E-mail: TByrd@ByrdTrialGroup.com

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 7,753 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Respectfully submitted this **March 16, 2015**.

*s/ Tucker H. Byrd*
Tucker H. Byrd, Esq.
Florida Bar No. 381632

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **March 16, 2015**, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

I FURTHER CERTIFY that I delivered (8) eight copies to the Clerk via hand delivery.

*s/ Tucker H. Byrd*
Tucker H. Byrd, Esq.
Florida Bar No. 381632